PEOPLE OF THE STATE OF CALI-
FORNIA, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

El Paso Natural Gas Company,
Intervenor.

No. 15687.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 25, 1961.

Decided March 30, 1961.

Certiorari Granted Oct. 9, 1961.
See 82 S.Ct. 47.

Mr. William M. Bennett, San Francisco, Cal., for petitioner.

Mr. Arthur H. Fribourg, Atty., Federal Power Commission, with whom Mr. John C. Mason, Gen. Counsel, Federal Power Commission, Mr. Howard E. Wahrenbrock, Solicitor, Federal Power Commission, and Mr. Robert L. Russell, Asst. Gen. Counsel, Federal Power Commission, were on the brief, for respondent.

Messrs. Charles V. Shannon, Washington, D. C., and Arthur H. Dean, New York City, with whom Mr. Stanley M. Morley, Washington, D. C., was on the brief, for intervenor.

Mr. Richard A. Solomon, Atty., Dept. of Justice, with whom Mr. George D. Reycraft, Atty., Dept. of Justice, was on the brief, for the United States of America, as amicus curiae.

Before Mr. Justice Burton, retired,[*] and Prettyman and Fahy, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is a petition by the State of California to review an order of the Federal Power Commission [1] authorizing El Paso Natural Gas Company (hereinafter referred to as "El Paso") to acquire and operate the facilities of Pacific Northwest Pipeline Corporation (hereafter called "Pacific") by a merger of the two corporations.

El Paso was organized as a natural gas company in 1928, and its principal business today is the transportation and sale of natural gas. Its chief sources of gas are in the Panhandle and Permian Basin fields of west Texas and the San Juan Basin in northwestern New Mexico; and it also obtains gas from Canada and through agreements with other pipeline companies. The company operates some 8,000 miles of main transmission lines, which extend in two parallel systems from western Texas, across New Mexico and Arizona to the California border. Expansion of El Paso's operations to California began in 1946, and the company's business expanded greatly in the following decade. Although it has many customers along its pipeline routes in Texas, New Mexico, and Arizona, the great bulk of its certificated capacity—2.1 million of a total of 2.7 million Mcf per day—is devoted to sales made at the Arizona-California border to three California distribution companies. It has no pipelines or facilities within California. At the time this litigation was initiated El Paso was the sole out-of-state supplier of natural gas to California, and it provided well over half of the state's total supply.

Pacific was incorporated in 1949 and was certificated in 1954 to serve the Pacific Northwest region, the only large area of the country not then served with natural gas. Construction of its system was completed in 1956, and at the time of the merger it owned more than 2,000 miles of pipelines extending from the Canadian border through Washington, Oregon, Idaho, Wyoming, Utah and Colorado. It obtains its gas supplies in the San Juan Basin, in several smaller fields in the Rocky Mountain area, and from Canada. Pacific is authorized to sell gas in all the states through which its lines extend, and it has a system capacity of about 646,000 Mcf per day. In 1958 its sales averaged about 500,000 Mcf per day.

In December, 1954, shortly after Pacific had been certificated, Pacific and El Paso entered into an agreement whereby

---

1. 22 F.P.C. 1091 (Dec. 23, 1959). The petition herein also seeks review of an order denying rehearing and a stay, 23 F.P.C. 350 (Feb. 17, 1960).

the latter was to purchase 250,000 Mcf per day of Canadian gas from Pacific. Simultaneously, Pacific contracted with Westcoast Transmission Company, Ltd., a Canadian gas company, to purchase 300,000 Mcf per day. The El Paso-Pacific contract was subsequently modified to provide for the purchase by El Paso of up to 100,000 Mcf per day of this Canadian gas. El Paso's president testified that it was at the time of these negotiations that his company first became interested in acquiring Pacific. Such an acquisition, he said, would provide El Paso with direct access to extensive undeveloped reserves of dry gas in Canada and the Rocky Mountain area and would give Pacific needed additional markets for its gas.

During the early part of 1955 the two companies discussed the possibility of a merger, but the talks broke down after a disagreement as to the method of merger. El Paso insisted that the merger be carried out in such a way as to require the approval of the Federal Power Commission under Section 7(c) of the Natural Gas Act, 15 U.S.C.A. § 717 et seq., that is, a merger of the assets of the two corporations. Pacific, which was then involved in financing and constructing pipelines, wanted to avoid extended proceedings before the Commission, and it insisted that the merger be accomplished by an exchange of stock.[2] In further negotiations El Paso proposed a stock exchange to be followed by an asset merger, but this was rejected by Pacific because of a disagreement on price and also because of its continued reluctance to go before the Commission. Talks resumed in August, 1956, and on November 8, 1956, the companies signed an agreement for the exchange of stock. By May 1, 1957, El Paso had acquired 99.8 per cent of Pacific's stock.

On July 22, 1957, the Attorney General of the United States filed a civil action in the United States District Court for the District of Utah, attacking the stock acquisition as a violation of Section 7 of the Clayton Act, 15 U.S.C.A. § 12 et seq. On August 7, 1957, the companies filed applications for approval of a merger of their assets.[3] This step had been authorized by their respective boards of directors on the preceding July 16th and was, by El Paso's own admission, "considerably stimulated" by the imminence of the Clayton Act suit.[4] The Commission refused a request by the Justice Department to suspend proceedings on the applications until the District Court decided the antitrust case, and it scheduled hearings for September 17, 1958. The Antitrust Division of the Justice Department was invited by the Commission to participate, but it declined. On October 13, 1958, the Dis-

2. It is clear that at least one of the reasons El Paso desired an asset merger was its belief that a Commission-approved acquisition of properties was less susceptible to attack under the antitrust laws than was a stock acquisition. El Paso's president testified that when merger was first considered by them they requested an opinion from their counsel on the antitrust implications of such a transaction. The following colloquy took place later in the proceedings:

"[Q. By F.P.C. Staff Counsel.] And at the time were you concerned with the possibility of the Justice Department objecting? [A.] Well, we wanted to do it that way, irrespective of the Justice Department, but it was perfectly apparent that from the standpoint of avoiding any possibility of trouble that was a better way to do it."

3. These took the form of an application by Pacific under Section 7(b) of the Act for permission to abandon facilities and services and an application by El Paso under Section 7(c) for a certificate approving acquisition of Pacific's facilities.

4. In both the November 8, 1956, stock exchange agreement and a proxy statement sent out to its shareholders shortly thereafter, El Paso represented that it had no present intention to merge the two companies or to acquire the assets of Pacific. According to testimony at the hearing these representations were made at the request of Pacific after the Internal Revenue Service had indicated that it would require such statements before ruling that the exchange would be tax-free to Pacific stockholders.

trict Court in Utah granted a continuance pending final determination by the Commission of the applications before it.

The merger was approved by the Presiding Examiner on November 20, 1959. Exceptions were filed by California, and on December 23, 1959, the Commission affirmed the Examiner's decision. A certificate was issued to El Paso,[5] and the merger was consummated on December 31st. After the asset merger the United States amended its Clayton Act complaint to include this merger as well as the stock acquisition.

Throughout these proceedings the State of California has taken the position that it should not be wholly dependent on a single company for its out-of-state gas supplies. It seeks the benefits of competition among suppliers and argues that the merger, if upheld, will eliminate a potential competitor to El Paso.

The principal contentions of California may be distilled into three: (1) The Commission did not give sufficient or proper attention to the impact of the merger upon future rates to customers; (2) the Commission failed to give proper attention and effect to the policies and terms of the antitrust laws; and (3) California was denied due process, in that the Examiner failed to examine documents filed in evidence. In the second contention it is supported by the United States as *amicus curiae*. Petitioner also attacks the conclusions of the Commission concerning various features of the proposed merger in respect to the public convenience and necessity. We have examined these latter points, the supporting evidence, and the findings and conclusions of the Commission. It is sufficient to say that decisions on such questions lie largely within the expert judgment of the Commission, and we find the conclusions reached in this case to be well within that area. We turn, then, to the principal contentions, as above stated.

Petitioner summarizes its contentions in respect to the rate inquiry as follows:

"By precluding inquiry into economic impact and denying examination upon future rate structure the Commission denied due process to California; created a record devoid of evidence upon an indispensable item of proof, to wit, public convenience and necessity measured in terms of the cost of merger to the consuming public; authorized a merger as being in the public interest with no inquiry of its cost impact to the public."

Petitioner makes clear in its argument that it contends there was a burden of proof upon El Paso, the applicant, to present evidence as to specific future rates after the proposed merger, and that the Commission erred in refusing to go into that subject. The Examiner ruled clearly and succinctly on the matter. He said:

"It seems to me there can be no aggrievement when there is no dollar impact at the present time on the consumer. It is merely a question of determining the public interest, and you must have some general idea whether it is going to be an [exploitation] of the customer—I realize all that. That is what the purpose of the certificate proceeding is.

"But when you get down to dollar impact, it does not come about until the rates are changed.

\* \* \* \* \* \*

"Well, unless I am directed to do so by order of the Commission, I am not going to make a rate case out of this—whether they are lawful under Section 4(a) or 4(b), whatever it is, of the Act. I am not going to do it unless directed to do it."

The Commission agreed with the Examiner.

---

5. Pacific's application to abandon, see note 3, *supra*, was denied, on the ground that no abandonment of service would actually occur. Instead, Pacific's certificates were rescinded and identical certificates were issued to El Paso.

■ We think the Examiner ruled correctly on the point and the Commission was correct in sustaining him. Increases in rates must under the scheme of the statute be proposed by the utility company. The Commission then, under either Section 4(e) or Section 5(a) of the statute, can determine the lawfulness of the proposals. No contention is made that the existing rates of the companies are unreasonable. No increases were proposed in connection with this merger, and a specific provision was inserted in the order that none should be proposed for a year after the merger. Schedules of rates are complicated affairs, involving classifications of customers and services, with underlying considerations of allocable costs. In the absence of any proposals for increases, a rate inquiry as to possible future requests would be entirely speculative. The Examiner correctly said, we think, that the "dollar impact" of the merger would have to await a rate inquiry. Of course such a future inquiry would involve consideration of costs, and the Commission was concerned lest the costs of the two systems be mingled after the merger in such fashion that the higher costs of one merged company might be imposed in part upon the former customers of the other company. California vigorously insisted that the cost of service would continue to be high for gas originating on the Pacific system and that the cost differential would at a future date be imposed on El Paso's customers in California. To make sure it would be able to deal with that problem should it arise, the Commission provided that the costs of the two merged companies should be kept separately.

Under our regulatory system, rates depend in large part on costs. If a merger must inevitably result in higher costs, this is a critical factor to be weighed in determining the public interest in the merger. Of course, if the merger creates new benefits for consumers, higher costs may be justified to some extent. Allocations of costs as between the two underlying systems may be an eventual factor in a rate case. The Commission protected that eventuality. The forecasts of both the Examiner and the Commission in the case at bar were that costs would be lessened in the long run. For example, the record shows that about one-half of the gas marketed by El Paso is residue gas, that is, gas produced as an adjunct to the production of oil. The average life of an oil well is relatively short; and, because the amortization period of the company's capital debt is related to the life of its reserves, El Paso has had a high amortization rate on its bonds, and consequently high financing costs. By the attachment of Pacific's extensive reserves of "dry" gas, that is, gas produced from gas wells, the life of El Paso's reserves will be increased and the cost of future financing will be correspondingly reduced. In addition, there is ample support in the record for the conclusions that substantial savings in total operating expenses and lower unit cost of transportation will be realized as a result of the merger. In sum, we think an inquiry into specific future rates was not required. Inquiry into the effects of the merger upon future costs, and thus perhaps ultimately upon future rates, was one of the factors to be weighed in evaluating the public interest in the merger. The Commission made such an evaluation, and we think it is sufficiently supported. We are of opinion that the contention of California on this point cannot be sustained.

Petitioner and the United States as *amicus curiae* contend that the Commission based its approval in part upon the erroneous thought that its approval of the proposed asset acquisition would immunize that transaction from liability under Section 7 of the Clayton Act; and that the Commission, in applying the standard of public interest, failed to give adequate consideration to the charges of illegality under the Clayton Act.

Section 7 of the Clayton Act contains, in pertinent part, the following as its last sentence:

"Nothing contained in this section shall apply to transactions duly

consummated pursuant to authority given by the * * * Federal Powerer Commission * * * under any statutory provision vesting such power in such Commission * * *."

▮ The question whether a transaction duly approved by the Commission, acting within its statutory authority, is or is not thereafter subject to the antitrust laws is not before us. The Commission has no authority to pass upon that question, and it has not purported to do so here. Its function is to approve—or not to approve—a proposed transaction. What status its conclusion may have in other areas or what happens thereafter to the transaction is not for the Commission to determine. The Commission has ample power to approve —or disapprove—the acquisition by one natural gas company of the assets of another such company. It has approved the one before us. It has no authority to declare the transaction immune from any antitrust law. The immunizing, if any, is done by the statute itself. The statute is a flat, simple statement, "Nothing contained in this section shall apply", etc. Thus the Congress itself described a boundary to its antitrust enactment. It did not confer upon the Power Commission authority to construe or execute that statute. It left that construction and execution to those authorities having to do with enforcement of the Clayton Act. But, we must caution in that regard, the Congress did put the approval of certain transactions in certain fields in the hands of a specified agency. It put approval of gas facility acquisitions in the hands of the Power Commission. It did not put that power in the hands of other authorities. This was a distribution of enforcement power among enforcement authorities, and the lines of the distribution must be recognized and respected.

▮ This brings us directly to the second phase of the argument on the point. This argument is (a) that the Commission, in considering whether to approve a transaction, must give heed to the policies and provisions of the antitrust laws, and (b) that it did not sufficiently do so in this case. We agree with (a) and disagree with (b).

▮ To approve a transaction the Commission must find it to be in the public interest. Clearly, the public interest includes the solution of problems in so important an area of economics and law as the so-called antitrust area. The Commission must consider the public policy, as declared by the Congress, in these respects. But here again a caution is in order. We are here dealing with the interweaving of free competition, regulated monopoly, and the public interest. Free competition is a basic postulate of our free enterprise system, but it is not always—in all conditions—in the public interest; sometimes regulated monopoly, or a measure of controlled monopoly, is in the public interest. The policy of the antitrust laws is to foster free competition. The policy of regulatory measures such as the Natural Gas Act is public regulation of controlled monopoly, or partial monopoly. Thus, in the fields of merchandising and manufacturing, the law prohibits interference with competitors or competition and requires full and free play to rivalries in the marketplace. The resultant constrictions upon prices and practices are deemed to be in the public interest. But, in the field of public utilities, monopoly, or partial monopoly, under public regulation is deemed to be in the public interest. Public utilities are treated as public services. The principal requirement is service, and service is not a necessary result of a competition bent on mutual destruction. Thus, for example, the public interest may require only one air carrier, or one railroad, between two points, or only one gas pipeline out of a given field or over a given area. Frequently a regulatory agency must determine whether one, two, or more companies should operate at a given place under given circumstances. A determination that only one regulated utility should operate is not in contravention of the antitrust laws. The antitrust laws and the regulatory laws are not in conflict; they are complementary. Both

have as their objective the public interest. They deal with different subject matters. They have been entrusted by the Congress to different enforcement agencies. When the Power Commission considers the policies and provisions of the antitrust laws in respect to the transactions of utilities under its jurisdiction, it is not required to—and indeed should not—begin with a general premise that competition is always and under all circumstances in the public interest.˙ · Its premise should be that the antitrust laws in certain areas of our economy and the regulatory laws in other areas are supplementary enactments and each must be given full effect in its area, recognizing always its concomitant body of law in the other area. The Commission must recognize the policies of the antitrust laws, but it must also recognize its own responsibilities under its own laws.

This brings us to consider what the Commission had to say in respect to the antitrust laws. The Commission took note of the terms and policy of the Clayton Act and stated its own responsibility under that Act and under the Natural Gas Act. It concluded that the elimination of Pacific as a potential competitor was not significant for two reasons: First, because of Pacific's poor financial condition it could not be considered a serious competitor to El Paso in California; and, second, there was in prospect substantial additional competition for El Paso in the expanding California market. Beyond this the Commission found that the public interest would be served in several respects by the merger: The combined system would be considerably strengthened by the increase in available gas supplies; development of sources and markets would be stimulated; the merged company would be in a stronger financial position; existing gas supplies could be more effectively used to meet emergencies in periods of peak demand; and, finally, cost saving would be realized that would ultimately be reflected in lower rates. Thus the Commission weighed one set of factors against the other. It did take into account the policies of the antitrust law and put them in the scale of factors. We think its course of action was its duty, well within its authority, and was a reasonable process. We find no error.

■ The United States argues that the Commission should have considered specifically the legality *vel non* of the stock acquisition as such. It stresses admissions on the part of El Paso officials that concern over the antitrust action prompted the asset acquisition. It says the asset transfer takes on the character of the antecedent stock acquisition and is to be judged by standards of the antitrust law. We think the transaction should be viewed realistically in its true and real nature. This was clearly a transaction for the acquisition of facilities and the consequent combination of those facilities into a single system. It was not basically a stock transaction, which, standing alone, is usually an investment venture. This was not considered or treated by the participants as an investment venture; it was a combination of physical facilities. The Commission has authority to approve the acquisition of facilities; the Natural Gas Act does not mention acquisitions of stock. Of course the acquisition of portions of the stock of a company is not an acquisition of assets. But it seems to us that the acquisition of all the stock of a company (or, as in this case, 99.8 per cent of the stock), with a consequent transfer of assets from the acquired subsidiary to the acquiring parent, is an acquisition of assets. It is indeed one of the most usual methods of acquiring assets. We think the transaction here involved cannot be split into two separate and independent transactions—one the acquisition of all the stock, over which transaction the Commission has no authority, and the other a transfer of assets, authority over which would be meaningless in terms of acquisition. So to view the transaction would (1) be unrealistic and (2) destroy the effectiveness of authority of the Commission over combinations of facilities. Congress intended this authority to be real and ef-

fective. We think that purpose cannot be thwarted by the simple procedure of first acquiring all the stock and then making an intracompany transfer of assets. It might be said that the Commission could refuse to permit a consolidation of facilities even though they were wholly owned by one company. Such a refusal would be meaningless in terms of ownership and control. Congress spoke of acquisitions, not of mere bookkeeping transfers. We think the acquisition of all the stock, vesting actual ownership, beneficial although not formally legal, in the acquirer, plus the subsequent transfer of the assets, made up the transaction of acquisition of the facilities.

■ California argues that the Examiner failed to accord it due process, in that he failed to give proper consideration to the record. Upon another occasion, in another proceeding, the Examiner remarked upon the needless volume of the record in this case. He said that, out of some 500 exhibits, between 15 and 25 were dispositive of the issue and there was no occasion to examine any more. He referred to "all this unnecessary work that must be done, all this unnecessary overdoing of the case that must be done before we ever determine what the issues are." We think the Examiner's remarks were both apt and appropriate. The inundation of the material with immaterial minutiae is one of the griefs which beset the administrative process. It is well to recognize it.

The order of the Commission will be

Affirmed.

FAHY, Circuit Judge, dissenting: Because of the matter now to be briefly discussed I am not able to agree entirely with the opinion of my Brother Prettyman, with most of which, however, I do agree.

The acquisition by El Paso Natural Gas Company of some 99 per cent of the stock of Pacific Northwest Pipeline Corporation led the United States to prepare to file suit against El Paso attacking the acquisition of the stock as a violation of section 7 of the Clayton Act. The suit was later filed in the District Court of the United States for the District of Utah. When the responsible officials of El Paso learned of the plans of the United States to file suit, the corporation, by using the very stock control being questioned by the United States, acquired Pacific Northwest's assets and facilities and then applied to the Commission for approval of this merger under section 7(c) of the Natural Gas Act.[1] The approval of the Commission was given in the order under review.

Assuming that the Commission has authority under its statute to immunize an asset merger from the antitrust laws of the United States, particularly section 7 of the Clayton Act, it is my opinion that the order approving the instant merger should not be affirmed. I am of this opinion because if the stock acquisition attacked in the suit filed by the United States is invalid under the antitrust laws the acquisition by El Paso of Pacific Northwest's facilities, constituting the merger which was approved, was contrary to public policy because accomplished by stock control obtained in violation of the antitrust laws. Clearly this would be a relevant consideration in determining whether the merger, though otherwise serving the public convenience and necessity, should be found to do so. If not invalid as contrary to public policy at least such a merger should be reconsidered in event the antitrust suit results favorably to the United States. This is not simply a matter of whether the public convenience and necessity would be served by the merger upon consideration of other relevant factors, including the general policy of the antitrust laws; it is a matter of whether a merger, accomplished by a particu-

---

1. If it is not clear, as I think it is, that the acquisition of the assets of Pacific Northwest by El Paso was a consequence of the action taken by the United States under the antitrust laws, it is certain that the contrary also is not clear, and the truth of the matter should be determined.

lar illegal acquisition of stock, can be approved consistently with sound public policy or be said to serve the public convenience and necessity.

For the reasons above stated I agree with the position of the United States as *amicus curiae* that the decision of the Commission should be vacated and the cause remanded with instructions that the Commission either deny the application for approval of the merger or await the outcome of the antitrust litigation.