The GOVERNMENT OF GUAM, Petitioner,

v.

FEDERAL MARITIME COMMISSION and United States of America, Respondents,

Pacific Far East Line, Inc., Intervenor.

No. 19574.

United States Court of Appeals District of Columbia Circuit.

Argued May 10, 1966.

Decided July 11, 1966.

Mr. Eugene L. Stewart, Washington, D. C., for petitioner. Mr. Thomas L. Delaney, Washington, D. C., also entered an appearance for petitioner.

Mr. Walter H. Mayo, III, Attorney, Federal Maritime Commission, with whom Asst. Atty. Gen. Donald F. Turner, Mr. Irwin A. Seibel, Attorney, Department of Justice, and Mr. M. C. Miskovsky, Solicitor, Federal Maritime Commission, at the time the brief was filed, were on the brief, for respondents. Mr. James L. Pimper, General Counsel, Federal Maritime Commission, also entered an appearance for respondent Federal Maritime Commission.

Mr. Mark P. Schlefer, Washington, D. C., with whom Mr. John Cunningham, Washington, D. C., was on the brief, for intervenor.

Before PRETTYMAN and WILBUR K. MILLER, Senior Circuit Judges, and MC-GOWAN, Circuit Judge.

PRETTYMAN, Senior Circuit Judge:

This is a petition for judicial review of an order of the Maritime Commission relating to freight rates in ocean transportation to and from Guam. It is the second consideration of the case by this court. Upon the first petition we remanded to the Commission for further findings and explanation upon two problems.[1] One problem concerned the allocation of overhead administrative expenses between subsidized and unsubsidized commerce. The Commission had used a voyage-expense prorate for this purpose. We directed it to state findings and conclusions upon this matter and, specifically, to show whether this method resulted in an inequitable allocation and a distorted rate base in this case. We find the Commission's treatment of this item upon the remand to be satisfactory, and its order in that respect is affirmed.

The other problem was the determination of working capital for inclusion in the rate base. The examiner to whom the case was assigned reported the parties to be in agreement that working capital should be calculated in accordance with General Order 31, 46 C.F.R. §

---

1. Government of Guam v. Federal Maritime Commission, 117 U.S.App.D.C. 296, 329 F.2d 251 (1964).

286.3(a) (1).[2] He said that the carrier contended the computation should be in accordance with Limitation (4) of that General Order, whereas Public Counsel and the intervenors, who included the Government of Guam and the General Services Administration, contended that Limitation (3) should be applied. The examiner cited Atlantic-Gulf/Puerto Rico General Rate Increases,[3] in which the Maritime Board said that in determining working capital as an element of a rate base in a rate proceeding "we will limit the amount to that determined under Limitation 4 of General Order 31 and give no consideration to Limitation 3." The examiner said that ruling must be followed. He then used the figure shown by the carrier, being $940,384 allocated to the Guam commercial traffic. So far as we are advised he gave no further detail on the item.

General Order 31 is a complicated combination of accounting provisions, but in substance Limitation (3) provides that Adjusted Working Capital should include current assets less current liabilities, and Limitation (4) says that working capital as determined under (3) should be allowed to the extent of the Total Average Voyage Expenses.

When the item came before the Commission it referred to Atlantic-Gulf/Puerto Rico and said that applying the same measure "we find the fair and reasonable allowance for working capital to be $1,118,524." Then it added, "Since working capital is the fund from which voyage expenses are paid, such expenses are the most accurate measure of the employment of working capital." In the tabulated finding of the fair value of property devoted to the Guam commercial traffic appears the item "Working Capital 1,118,524". No further explanation or comment was vouchsafed.

Of course working capital is not unequivocally "the fund from which voyage expenses are paid". Frequently, when revenue is received in advance of performance, or the payment of the expense is postponed until after the receipt of revenue, expenses are met from revenue; or they are met from borrowed funds, or from insurance receipts, or from reserves such as depreciation. So the generalization used by the Commission is of little value as a guidepost in a test of a computation. We are not now talking, of course, about the final compensation for expenses in a rate-making proceeding; they are a direct deduction from revenue to compute the return. We are talking about an available supply of funds from which to meet expenses in the actual practical payment thereof. This is the purpose and function of working capital.

We remanded "in order that the Commission may make the findings and state the conclusions which resulted in the ultimate conclusion it reached on this point." In response the Commission made no findings but instead supplied us with an argumentative dissertation in support of the rule it said it was following. In the course of that discussion the Commission said, *inter alia:*

"Guam looks upon working capital in terms of a fund used to meet a time lag between expenses incurred and revenue received. But working capital is more than this. It must sustain the carrier when emergencies or unforeseen events result in large outlays of cash not met by corresponding inflows of revenue. The carrier must be financially prepared for vessel accidents, vessel layups, strikes, declines in traffic, and delays in the adjustments of rates which are necessary to meet increased costs. During these periods when revenue may be cut off or curtailed, certain of the carrier's expenses continue, such as overhead, vessel insurance, maintenance and repairs, van and container, and other property rentals, principal and interest on mortgages."

2. This is a general order issued by the Maritime Administration in respect to subsidized operations, and relates to the determination of "recaptures" of subsidy payments.

3. 6 F.M.B. 14, 36 (1960).

The foregoing quoted passage leaves us with several difficulties. (1) We are not given any supporting rationale for the proposition that the item "working capital" in a rate base includes provisions for accidents, layups, strikes, declines in traffic, and delays in adjustments in rates. Without such assistance we would be inclined to think that losses incurred by reason of vessel accidents would be met by proceeds from insurance, the premiums on which are deductible as expenses in the profit-and-loss calculation. And we would think that the burdens of strikes are most frequently met by temporary borrowing. The point is that we are without material by means of which we can exercise the judicial duty resting upon us to test the validity of the Commission's ultimate conclusion against a vigorous attack by a responsible party. The brief filed on behalf of the Commission in the present proceeding is quite valueless, being merely a brief paraphrase of the Commission's opinion.

The definition of working capital in Barnes's Economics of Public Utility Regulation is: "Working capital, rather, is an allowance for the sum which the company *needs to supply from its own funds* for the purpose of enabling it to meet its *current obligations* as they arise and to operate economically and efficiently." [4] The words "current obligations" exclude nebulous or contingent considerations. They confine the function of this category of working capital to coverage of a definite, reasonably predictable lag or gap between the outlay of expenses and the payment by the customer of the charges for the services rendered.

The intervenor asserts that the prepayment of freight expenses affects only what it calls category (a) of working capital, or "cash to cover time lag between expenditures and revenues". It claims that there is another category which should be and has been considered by various agencies in setting working capital, i. e., a cash buffer fund for con-tingencies. The cases cited in support of that assertion do not, when read individually, support the assertion. Intervenor argues, admitting that the support is not direct or in terms, that the reasonable extension or interpretation of the cited opinions dictates support of its asserted position. The cases do not authorize inclusion in working capital of such speculative sums. The mention of contingency is restricted by the opinions to unforeseen or unpredictable lag between expense and receipt of payment—a natural extension of the aforementioned lag factor.

> "Working capital is understood to include, usually, three parts: First, the investment in a stock of material and supplies; second, the cash necessary to pay the operating expenses incurred for common-carrier service prior to the time when the revenues from that service are available; and, third, a buffer fund of cash constantly on hand to cover amply the recurrent and fluctuating deficiencies in the inflow of revenue *applicable to payments falling due.*" (Emphasis added.) [5]

Clearly the Interstate Commerce Commission did not in the above-quoted opinion set a precedent for the inclusion in the computation of working capital of any provision for such contingency factors as the intervenor suggests. It merely emphasized the contingency and the instability of the "lag" item. Had it intended to extend the proper elements of working capital, the limitation "applicable to payments falling due" would have no meaning.

The intervenor urges the term "buffer fund", which is used in several opinions in the public utility area. [6] It argues that various contingencies, such as strikes, vessel accidents, and even unexpected declines in traffic, justify a large working capital item. Such an allowance would in turn permit much higher rates on the mere possibility of such occur-

---

4. Barnes p. 495 (1942). (Emphasis on the words "current obligations" added.)

5. Blue Ridge Ry. Co., 97 I.C.C. 744, 759 (1925).

6. *E. g.*, Alaskan Rates, 2 U.S.M.C 558 (1941); General Increases in Alaskan Rates and Charges, 7 F.M.C. 563 (1963).

rences. That procedure would allow the utility to charge its customers just in case some unhappy contingency should befall the utility in its future operation. This argument was disposed of in Northampton and Bath Railroad Company:

> "Cash required to cover casual operating deficits due to the temporary falling off of traffic is not working capital, any more than is the steady supply of cash, as by a parent company, to cover a chronic operating deficit. Both are the result of adverse conditions of the business, which are part of the risks assumed by the enterprise and are not underwritten by the patrons."[7]

The very concept of working capital is of a buffer fund. It is properly used to buffer the utility during the normal expected period of lag between outlay of shipping expenses and receipt of payment thereof (a less compelling factor in this case, since much of this shipping expense was prepaid), and also to insulate or buffer the utility from possible unexpected lag due to the unpredictable nature of such transactions. Further, the working capital item can properly provide for materials and supplies required for operation. However to compel the patrons to insure the company through high rates against loss from strikes, accidents, or traffic decline places too much of the risk of the enterprise on parties who do not stand to share in the financial success of the company. If the stockholders in this case have pledged a large sum to a contingency fund being held to insure the company from financial crises, and merely ask for a fair return on that money, we should have findings to that effect.

Intervenor has read the Alaskan Rates cases rather too enthusiastically for its own argument. The mention of the propriety of a buffer fund in those opinions was followed by a precise expression of the purpose of the fund, "to cover the fluctuating deficiencies in the receipt of cash from operating revenues necessary to meet maturing operating payments."[8] Intervenor interprets this language to refer to a wide range of causes for the decline in revenue of the carrier—strikes, accidents, and even simple decline in traffic,—whereas the language quite clearly restricts its coverage to deficiencies *in the receipt* of cash, that is, precisely, the lag between expense and payment, which both parties and the Commission agree is a proper element of the working capital figure.

(2) We are without facts or figures to show whether this carrier did indeed have working capital provisions in its financial structure and, if so, how much; or whether it included amounts for accidents, layups, strikes, declines in traffic, delays in rate adjustments, or any other contingencies, and, if so, how much for each. We are without any supporting factual data for any part of this allowance in the rate base. If a carrier kept on hand a large part of a million dollars in cash, or property easily and quickly convertible into cash, for use in meeting fixed expenses in the event of a strike, instead of relying upon short-term borrowing for that contingency, the policy might be regarded by some as inept financing; but, if the investors in the carrier really supplied the funds for that purpose, they would probably be entitled to a fair return on its use, payable by the customers. The "if" in that situation would be the possibility that some regulatory agency would not deem the practice reasonably necessary and so would not allow the item in working capital in the rate base.

(3) We are not certain as to what is the Commission's basic concept of the working capital item in the rate base. This is not an expense item, and so the ratepayers do not supply this amount for use by the carrier in meeting certain expenses. This is a rate-base item. It

---

7. 149 I.C.C. 244, 269 (1928).

8. 2 U.S.M.C. at 566.

means that the public says to the carrier, in effect, "If you are compelled by the exigencies of your operation to carry certain amounts of your own money readily available to meet expenses at times when you are having no revenue, we will pay you a fair return on those amounts, just as though you had them invested in property used in your business." Working capital is the carrier's own money. It is real, factual. It is not a theoretical assumption. Its inclusion in the rate base and the consequent return permitted upon it can no more be allowed in respect to a non-existent fund than could a non-existent boat be included in the rate base. But in the case now before us we are not given any findings by which we can ascertain what the facts are or determine whether they support the conclusion.

(4) We are given no explanation of the difference between the $940,384 which the examiner put in his table of values for the Rate Base in the Guam Commercial Traffic and the $1,118,524 found by the Commission and included in its fair value of property devoted to the carriage of commercial cargo in the Guam trade. A total of $1,216,816 in ships and all other property devoted to the business and $1,118,524 of working capital required, although freight charges were usually and principally prepaid, is a combination of figures which incites inquiry. The exhibit (No. 121) in the record shows on the liability side as of June 30, 1960, unterminated voyage revenue of $455,289.-65. And the Commission's reference to the rate of return earned by the carrier is of no weight upon this point, since the point concerns the rate base upon which the rate of return is computed. If the carrier earns $100,000 net and its rate base is $1,000,000, its rate of return is 10 per cent, but, if the rate base is $2,-000,000, its rate of return figures out to be 5 per cent.

■ The carrier insists with vigor that ample evidence to support its claims as to working capital is in the record. If so, the Commission should make findings in respect to it. It is not our function to locate or to evaluate in the first instance evidence in a record before us.

■ We do not mean to hold that the Commission must make detailed factual findings in respect to every item involved in any of the many complicated transactions which it must consider in the performance of its duties; but, when a factual item is seriously disputed, and especially in the event of a remand from a reviewing court, findings in sufficient detail to support the ultimate conclusion of the agency against the attack must be made by the agency.

The Commission should also make findings which will permit us to ascertain whether the use of General Order 31 was proper in this case. That Order was issued by the Maritime Administration for the purpose of controlling the grant of subsidies. The working capital allowance for those purposes was the amount given the carrier by the Government in the form of a subsidy for the purpose of permitting it to carry on its business effectively and economically. But working capital in a rate base, upon which customers must pay the utility a fair return, is a different concept. The basic idea of a rate base is of property devoted by investors to public service, for which the public (represented by customers) must pay fair compensation. As part of the rate base, working capital falls within that definition. It is property supplied by investors for the purpose of carrying on the business. Professor Barnes's Economics of Public Utility Regulation contains a clear and succinct discussion of the subject (pp. 495–496). It would seem that a principle applicable to the determination of the amount of a subsidy properly to be paid by the Government is also applicable to the determination of a rate base for rate-making, so long as the investors are supplying the amounts allowed. But an amount which

*should* be allowed, as in a subsidy, cannot actually *be* allowed, as in a rate base, unless it exists. A witness for the carrier (Ross, R. 403) testified that "Generally, you do consider" working capital to be the difference between current assets and current liabilities. But that is Limitation (3) of General Order 31 and is specifically rejected by the Commission. An exhibit (Ex. No. 121) shows a calculation of this Limitation (3) for the commercial service as indicating the proper allowance for working capital to be $310,702.-78.

A curious feature of General Order 31 in the context of this case is that Limitation (4) provides the extent to which working capital computed under Limitation (3) can be allowed. It says "Adjusted Working Capital as determined under Limitation (3) shall be allowed as capital employed to the extent of the Total Average Voyage Expenses employed in subsidized operations determined as follows: * * *." We have not been supplied with data by which we can ascertain the accuracy of the Commission's calculations in these circumstances. Clearly the Commission did not apply the average voyage expenses (Limitation (4)) as a limitation upon the excess of current assets over current liabilities (Limitation (3)).

■ For all the foregoing considerations the case must be remanded again. The Commission must make findings of fact which justify conclusions which in turn support the ultimate conclusion reached by the Commission. This will require, *inter alia*, findings as to the facts of the working capital held or utilized by this carrier, the amount or amounts, the sources, the uses, or the potential uses indicated by the experience of this or other companies, and all other factual features of the operation which are material to show the validity of the Commission's conclusions.

So ordered.