329 F.2d 251
 The GOVERNMENT OF GUAM, Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America, Respondents,
Pacific Far East Line, Inc., American President Lines, Ltd., Intervenors.
 No. 17488.
 United States Court of Appeals District of Columbia Circuit.
 Argued October 24, 1963.
 Decided January 23, 1964.
 
 Mr. Eugene L. Stewart, Washington, D. C., for petitioner.
 Mr. Jon Magnusson, Atty., Federal Maritime Commission, with whom Mr. James L. Pimper, Gen. Counsel, and Mr. Robert E. Mitchell, Deputy Gen. Counsel, Federal Maritime Commission, and Messrs. Robert L. Wright and Irwin A. Seibel, Attys., Dept. of Justice, were on the brief, for respondents.
 Mr. Mark P. Schlefer, Washington, D. C., with whom Mr. J. Lovering Truscott, Washington, D. C., was on the brief, for intervenor Pacific Far East Line, Inc.
 Mr. Alfred L. Scanlan, Washington, D. C., with whom Mr. Warner W. Gardner, Washington, D. C., was on the brief, for intervenor American President Lines, Ltd.
 Before PRETTYMAN, Senior Circuit Judge, and WILBUR K. MILLER and McGOWAN, Circuit Judges.
 PRETTYMAN, Senior Circuit Judge.
 
 
 1
 This is a petition to review an order of the Federal Maritime Commission approving two rate increases for the transportation of commodities by water between the United States and Guam. The petitioner is the Government of Guam. The transportation companies involved are the Pacific Far East Line, Inc., and the American President Lines, Ltd. They are intervenors in this court.
 
 
 2
 Approximately half the population of Guam consists of United States military and civil service personnel and their dependents. The principal activities on the Island are related to the military establishment. Guam is directly dependent upon ocean transportation from the United States for virtually all goods consumed on the Island. The two companies here involved are the only common carriers serving the Island.
 
 
 3
 A threshold question must be considered. Pacific Far East says the Government of Guam has no standing to petition for review in this proceeding, because it is not a "party aggrieved" within the meaning of the statute.[1]
 
 
 4
 The Government of Guam was admitted as a party to the proceeding before the Commission. In its petition for review it alleges that the carriers here involved are the only ocean transportation carriers providing freight service between the United States and Guam, and that "The lawfulness of freight rates and charges is of vital concern to the Government and people of Guam, the economics of whose very existence is predicated on the ocean freight supply line to the United States." It alleges that it is aggrieved by the Commission's order. Pacific Far East says Guam's only basis for standing is its capacity as parens patriae, and points to cases such as our State of Minnesota ex rel. Lord v. Benson[2] and the Supreme Court cases of Massachusetts v. Mellon,[3] Florida v. Mellon,[4] and similar cases. But the Benson case dealt with the problem of parens patriae in respect to an action of the Federal Government itself, i. e., a milk regulation, and the Supreme Court cases dealt with the capacity to sue as a plaintiff in the federal courts. We think they are not applicable here. It has long been recognized that in utility cases involving private operators a state or municipal government may be a proper party and, if adversely affected as such by an order, is aggrieved. Thus, in People of State of California v. Federal Power Comm'n,[5] the allegation of California was that it was aggrieved "in that your petitioners are charged with the duty of protecting the interests of the several million gas consumers in the State of California, the vast majority of whom are served by the aforementioned California public utilities." And in Commonwealth of Puerto Rico v. Federal Maritime Board[6] we recognized the government of Puerto Rico as a proper petitioner for review in a case precisely like the one presently at bar, procedurally speaking. In that case (Puerto Rico) we specifically denied a motion to dismiss grounded upon lack of capacity in the petitioner for review. The doctrine of the matter is reflected in the cases cited in the margin.[7] We regard the point as foreclosed.
 
 
 5
 We come then to the case on the merits. Petitioner presents, principally, four questions.
 
 
 6
 1. For rate-base purposes the Commission, following the prudent-investment theory, which in this case was the net book value, used December 31, 1959, as the valuation date of property committed to the trade.[8] Guam says that this was error and contends that the valuation date should be June 30, 1960. Guam premises its position on the fact that the Commission, in computing revenues and expenses for a test year, used the actual figures[9] for the six-month period January to June, 1960, and then multiplied by two. This calculation gave it a test year of 1960, which was a projection based upon actual figures for the first six months.
 
 
 7
 In the first place, this point is of "negligible importance. Its presence or absence would not make the difference between confiscation and a fair return."[10] The disputed amount is $72,212. Using the projected net annual profit of $150,121, an adjustment of $72,000 in the rate base would affect the rate of return by one-fifth of one per cent.
 
 
 8
 In the second place, the selection of a method or formula for computing permissible rates is for the Commission, unless its action is arbitrary.[11] A method similar to the one followed here has been used in other cases, both by the Federal Maritime Commission and by the Interstate Commerce Commission.[12] It is a rational method for test-year purposes in a projection of future rates. We cannot say its use here was arbitrary.
 
 
 9
 2. In addition to military goods and freight and other commercial cargo, the transportation companies carried in the test period a certain amount of bulk cement. Prior to the effectiveness of the tariffs here in dispute, this cement was carried under a special contract, and the carriage was at rates less than the published tariffs. In its projected rate base, revenues and expenses, the Commission included figures attributable to the carriage of this bulk cement, along with the figures for other commodities moving under the tariffs under consideration. Guam says that bulk cement should have been segregated and treated as non-tariff freight.
 
 
 10
 The tariffs under consideration contained a rate applicable to bulk cement, and the Commission found that this cement has been moving under that rate since July 1, 1960. Thus, as a matter of fact, this freight has been a tariff freight under the schedules involved in this proceeding.
 
 
 11
 Guam argues that the transportation of bulk cement was a "one-time movement not to be repeated in the future which moved at all only because of the special rate granted in a clear departure from the tariff." We think, however, that the Commission's finding is adequately supported by the record. Two of Pacific Far East's witnesses testified that at the time of the hearing cement was being moved under the tariff rate, and nothing in the record directly contradicts this testimony.
 
 
 12
 Guam says that bulk cement is a non-compensatory item, in that amounts paid for its carriage are not sufficient to pay the expenses of that carriage when those expenses are calculated on a proportionate basis with other items of freight. But it frequently happens that, when general revenues and expenses are computed on an overall basis, applicable to the entire business of a carrier, some items, if separated, appear as carried at non-compensatory rates. This result ensues from the compelling obligation of the carrier to render public service, and it has been approved.[13] The doctrine is applicable here. These rates apply to ocean transportation, and the fact is that when a vessel moves, the whole vessel moves; the carrier is not divisible into parts adjusted to the amount or character of freight being moved on a particular trip. Bulk cement is a "filler" cargo. It is accepted for carriage on a space-available basis. The handling is at the expense and risk of the shipper, and the only expense borne by the carrier is the added vessel time in port. Thus whatever revenue is derived in the carriage of this freight tends to reduce the charges necessarily made to other shippers. We think Guam's contention on this matter cannot be sustained.
 
 
 13
 3. The service of Pacific Far East is in part subsidized. In respect to certain general expenses direct allocations are impracticable. Therefore in respect to such expenses an allocation between subsidized and unsubsidized service had to be made upon some doctrinal basis. The Commission made this allocation on a voyage expense prorate. It said: "Overhead expenses should be allocated on the basis of voyage expense. They should follow the expense to which they relate." Guam says that such a prorate does not equitably allocate as between the two services. It says that the effect of the method is to charge the unsubsidized trade with a substantial amount of the expenses actually due to the subsidized service. The Maritime Administration has a General Order (No. 31) which requires that, where direct allocations are impracticable, income and expenses shall be allocated between subsidized and unsubsidized operations on the basis that the operating and maintenance expenses separately bear to the total of such expenses.
 
 
 14
 The problem posed by a situation such as the one we have just outlined is not a simple one, nor is it susceptible of a scientifically precise answer. The Supreme Court had occasion to refer to the difficulty in the Colorado Interstate Gas case[14] and in New York v. United States.[15] Since allocation involves judgment and discretion, the method used here by the Commission has support in the General Order of the Maritime Administration to which we have referred, and a similar method has been used in other cases.[16]
 
 
 15
 It has long since been established, as we have already remarked, that the selection of methods and formulae for the computation of factors essential to rate fixing is for the Commission and not for the courts. However there is a judicial duty of review in these matters, and it is equally well established that the reviewing authority is entitled to know — indeed must know — the basic data and the whys and wherefores of the Commission's conclusions.[17] We find this latter doctrine applicable to our disposition of this dispute concerning administrative overhead. It may well be that administrative overhead usually follows allocable expenses; but this is not always necessarily true, and, where it is not true, the truth, if ascertainable, must prevail.
 
 
 16
 Guam vigorously contends that the subsidized service involves a lesser proportion of directly allocable voyage expenses but a greater proportion of the administrative overhead. It says the record shows that voyage expenses in the subsidized service have been decreasing sharply, due largely to new and better equipment, while expenses in the unsubsidized service have remained constant; but the requirements of the subsidized operation consume an enormous part of the general administrative overhead, due to the accounting requirements of subsidies. Guam says that the combination of these two factors results, under the disputed prorate, in loading the unsubsidized service with a vast amount of overhead expense it does not in fact incur. This inequity is of so considerable an amount that the rate structure is distorted, Guam says.
 
 
 17
 Our difficulty in this situation is that the Commission made no findings on the point. It merely stated the abstract proposition that overhead expenses should "follow the expense to which they relate" and applied the voyage expense prorate without stating any facts against which we can test the accuracy of the result. Since the case must be remanded for another reason, the Commission should, and is now directed to, avail itself of that opportunity to state its findings and conclusions upon the problem posed by Guam on this item; that is, whether the application of the voyage expense prorate results, upon the facts of this particular case, in an inequitable allocation and a distorted resultant rate structure. If it did, the Commission must determine how a fair and equitable result can be reached. It will be so ordered.
 
 
 18
 4. A similar situation obtains in respect to the item of working capital included by the Commission in the rate base. A rate base computed at the value of property devoted to the service to which the rate pertains is often still short of the total amount of funds needed by the company in order to do business. A business concern must have funds for current operating purposes and to meet other imperative needs, especially until such time as revenues begin to come in. This is called "working capital". It is a proper rate-base item. Working capital has been variously defined, but for rate-making purposes the most generally adopted definition is that of Barnes, as follows:
 
 
 19
 "Working capital, in the technical sense in which it is here employed, does not include the total liquid funds with which the business is conducted. It is not the property which the business has; that is, it is not the excess of current assets over current liabilities. Working capital, rather, is an allowance for the sum which the company needs to supply from its own funds for the purpose of enabling it to meet its current obligations as they arise and to operate economically and efficiently."[18]
 
 
 20
 In the case at bar Guam says no working capital was necessary, since all shipping charges were prepaid and thus the carrier had funds sufficient to finance all operations and at a time in advance of the incurrence of the costs thereof. But we think this sweeping generality is not accurate. The Commission and the company show the need for some amount of working capital. However there is a real question as to what amount.
 
 
 21
 The Commission used a formula upon which it has relied at least since 1957.[19] It allowed as working capital an amount computed as the sum total of the voyage expense of one round trip for each vessel in the Guam service after allocation for the commercial cargo. This yielded a figure of considerable size — $1,118,524 in a total rate base of $2,335,340. An apparent incongruity comes immediately to notice. Working capital is rarely, if ever, so large a proportion of the funds committed to this type of enterprise.[20] And certainly the prepayment of shipping charges is a factor tending to lessen working capital needs.[21]
 
 
 22
 The nub of the point here is that working capital is not a doctrinaire entry in the rate base; it is a realistic allowance — realistic in need and realistic in amount. Its inclusion in a rate base must bear a real relationship to the realities of the situation. The problems here are: For what purposes did this company need working capital, and how much did it need for those purposes?
 
 
 23
 Our difficulty here is much the same as it was in respect to the item last above-discussed. The Commission made no findings and stated no conclusions to support its reason for applying the formula used. It cited authority for and described the formula, and then justified its application by saying:
 
 
 24
 "Since working capital is the fund from which voyage expenses are paid, such expenses are the most accurate measure of the employment of working capital."
 
 
 25
 We cannot tell from the data before us whether the amount thus included was or was not within the discretionary power of the Commission. The case must therefore be remanded in order that the Commission may make the findings and state the conclusions which resulted in the ultimate conclusion it reached on this point. It will be so ordered.
 
 
 26
 Affirmed in part and remanded in part.
 
 
 
 Notes:
 
 
 [1]
 Sec. 4, Judicial Review Act of 1950, 64 Stat. 1130, 5 U.S.C. § 1034
 
 
 [2]
 107 U.S.App.D.C. 106, 274 F.2d 764 (D.C.Cir. 1960)
 
 
 [3]
 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923)
 
 
 [4]
 273 U.S. 12, 47 S.Ct. 265, 71 L.Ed. 511 (1927)
 
 
 [5]
 111 U.S.App.D.C. 226, 296 F.2d 348 (D.C.Cir.1961), rev'd on other grounds, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962)
 
 
 [6]
 110 U.S.App.D.C. 17, 288 F.2d 419 (D. C.Cir. 1961)
 
 
 [7]
 Georgia v. Pennsylvania R. Co., 324 U.S. 439, 450-51, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); Pennsylvania v. West Virginia, 262 U.S. 553, 591-592, 43 S.Ct. 658, 67 L.Ed. 1117 (1923); New York v. United States, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947); State of Wisconsin v. Federal Power Comm'n, 112 U.S.App.D.C. 369, 303 F.2d 380 (D.C. Cir. 1961), aff'd, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963) (California and its Public Utilities Commission, petitioners in one of the three cases here involved, obtained review by alleging only the interests of citizens); Michigan Consolidated Gas Co. v. Federal Power Comm'n, 108 U.S.App.D.C. 409, 283 F.2d 204 (D.C.Cir.), cert. denied, Panhandle Eastern Pipe Line Co. v. Michigan Consol. Gas. Co., 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960) (in petitions here the State of Wisconsin and the City of Detroit alleged only the interests of their citizens); City of Pittsburgh v. Federal Power Comm'n, 99 U.S.App. D.C.113, 237 F.2d 741 (D.C.Cir. 1956); City of Detroit, Michigan v. Federal Power Comm'n, 97 U.S.App.D.C. 260, 230 F.2d 810 (D.C.Cir. 1955), cert. denied, 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48 (1956); State of Wisconsin v. Federal Power Comm'n, 92 U.S.App.D.C. 284, 205 F.2d 706 (D.C.Cir.1953), aff'd sub nom. Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954)
 
 
 [8]
 Some minor items, totaling $8,005, were valued as of June 30, 1960
 
 
 [9]
 Since Pacific Far East transported by far the greater portion of non-military freight, it was treated as the dominant carrier and its figures were used for test purposes
 
 
 [10]
 Dayton Power & Light Co. v. Public Utilities Comm'n, 292 U.S. 290, 310, 54 S.Ct. 647, 78 L.Ed. 1267 (1934)
 
 
 [11]
 Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), and the many cases in which that decision has been followed. See, e. g., Mississippi River Fuel Corp. v. Federal Power Comm'n, 82 U.S.App. D.C. 208, 163 F.2d 433 (D.C.Cir. 1947)
 
 
 [12]
 See General Increases in Alaskan Rates and Charges, 7 F.M.C. 563 (1963); Increased Freight Rates, 270 I.C.C. 403 (1947); Increased Railway Rates, Fares and Charges, 264 I.C.C. 695 (1946). Cf. Atlantic and Gulf-Puerto Rico General Increases in Rates and Charges, 7 F.M.C. 87, 101 (1963)
 
 
 [13]
 See B. & O. R. R. v. United States, 345 U.S. 146, 73 S.Ct. 592, 97 L.Ed. 912 (1953)
 
 
 [14]
 Colorado Interstate Gas Co. v. Federal Power Comm'n, 324 U.S. 581, 589, 65 S.Ct. 829, 89 L.Ed. 1206 (1945)
 
 
 [15]
 331 U.S. 284, 335, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947)
 
 
 [16]
 Pacific Coast/Hawaii and Atlantic-Gulf/Hawaii General Increases in Rates, 7 F.M.C. 260, 288 (1962); Re Northern Nat. Gas Co., 95 P.U.R. (NS) 289, 308 (FPC 1958); Re Mississippi River Fuel Corp., 95 P.U.R. (NS) 435, 461-62 (FPC 1958); Re Shell Oil Co. of Canada, 31 P.U.R.3d 503, 514 (Alberta Bd. of Pub. Util. Comm'rs 1959)
 
 
 [17]
 Colorado-Wyoming Gas Co. v. Federal Power Comm'n, 324 U.S. 626, 634, 65 S.Ct. 850, 89 L.Ed. 1235 (1945); South Carolina Generating Co. v. Federal Power Comm'n, 249 F.2d 755, 763-764 (4th Cir. 1957), cert. denied, 356 U.S. 912, 78 S.Ct. 668, 2 L.Ed.2d 585 (1958); Mississippi River Fuel Corp. v. Federal Power Comm'n, 82 U.S.App.D.C. 208, 163 F.2d 433 (D.C.Cir. 1947)
 
 
 [18]
 Barnes, Economics of Public Utility Regulation 495 (1942). See Alabama-Tennessee Nat. Gas Co. v. Federal Power Comm'n, 203 F.2d 494, 498 (3d Cir. 1953); Trunkline Gas Co. v. Federal Power Comm'n, 247 F.2d 159, 165 (5th Cir. 1957); General Increases in Alaskan Rates and Charges, 5 F.M.B. 486, 499 (1958); Re Western Union Telegraph Co., 25 P.U.R.3d 385, 421-28 (FCC 1958). See also Bauer, Public Utility Valuation 289-300 (1934); Clemens, Economics and Public Utilities 173 (1950); Stecher, The Determination of Working Capital in Railroads and Public Utilities, 39 Yale L.J. 927 (1930)
 
 
 [19]
 See Pacific Coast/Hawaii and Atlantic-Gulf/Hawaii General Increase in Rates, 5 F.M.B. 347, 350, 355 (1957); General Increases in Alaskan Rates and Charges, 5 F.M.B. 486, 499-500 (1958); Atlantic & Gulf-Puerto Rico General Increases in Rates and Charges, 6 F.M.B. 14, 35-36 (1960), remanded Commonwealth of Puerto Rico v. Federal Maritime Bd., 110 U.S.App.D.C. 17, 288 F.2d 419 (D.C.Cir. 1961), report on remand, 6 F.M.C. 87, 109 (1962). Arguments against the use of this formula were presented to this court in thePuerto Rico case, and, although our opinion did not mention the point, we did remand for failure of the Board to state "the reasons or basis therefor, upon all the material issues of fact, law or discretion presented on the record".
 
 
 [20]
 Here the working capital allowance was approximately 47 per cent of the total rate base. This is over twice the proportion of working capital to the rate base in a sampling of other recent maritime rate cases. See cases cited in note 19,supra.
 
 
 [21]
 Authorities agree that the need for working capital arises primarily from the time lag between the payment of expenses and the receipt of payments in respect to which the expenses were incurred. See Alabama-Tennessee Nat. Gas Co. v. Federal Power Comm'n, 203 F.2d 494, 498 (3d Cir.1953); City of Pittsburgh v. Pennsylvania Pub. Util. Comm'n, 370 Pa. 305, 88 A.2d 59, 61-62 (1953); Los Angeles Gas & Electric Corp. v. Railroad Comm'n, 58 F.2d 256, 262 (S.D.Cal.1932); General Increases in Alaskan Rates and Charges, 5 F.M.B. 486, 499 (1958); Re South Carolina Gen. Co., 15 P.U.R.3d 289, 305 (FPC 1956); Re Potomac Elec. Power Co., 55 P.U.R. (NS) 65, 81-82 (D.C. Pub. Util. Comm'n 1944); Clemens, Economics and Public Utilities 173 (1950)