344 F.2d 810
 ALASKA STEAMSHIP COMPANY, a corporation, and Northern Commercial Company, a corporation, d/b/a Northern Commercial Co. River Lines, Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America, Respondents,
State of Alaska, Intervenor.
 No. 19297.
 United States Court of Appeals Ninth Circuit.
 April 15, 1965.
 Rehearing Denied May 21, 1965.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Edward G. Dobrin, Stanley B. Long, Arthur G. Grunke, Bogle, Bogle & Gates, Seattle, Wash., for petitioners.
 James L. Pimper, Gen. Counsel, Robt. E. Mitchell, Deputy Gen. Counsel, Walter H. Mayo, III, F.M.C., Washington, D. C., Wm. H. Orrick, Jr., Asst. Atty. Gen., Irwin A. Seibel, Atty., Dept. of Justice, Washington, D. C., for respondents.
 Warren Colver, Atty. Gen. of Alaska, Juneau, Alaska, Richard S. Sasaki, Honolulu, Hawaii, for intervenor, State of Alaska.
 Before HAMLEY, MERRILL and DUNIWAY, Circuit Judges.
 HAMLEY, Circuit Judge:
 
 
 1
 Alaska Steamship Company (Alaska Steam) and Northern Commercial Company (Northern Commercial) have petitioned for review of two orders of the Federal Maritime Commission entered in a rate investigation proceeding. The State of Alaska has intervened in support of the Commission orders.
 
 
 2
 The rate investigation was conducted in discharge of the Commission's functions and responsibilities under the Shipping Act, 1916, 39 Stat. 728, as amended, 46 U.S.C. § 801 et seq. (1958), and the Intercoastal Shipping Act, 1933, 47 Stat. 1425, as amended, 46 U.S.C. § 843 et seq. (1958). The review in this court was instituted pursuant to the Review Act of 1950, 64 Stat. 1129, 5 U.S.C. § 1031 et seq. (1958).
 
 
 3
 Alaska Steam is a carrier by water in the Alaska trade. The company serves all of the areas of the State of Alaska as a common carrier by water to and from the ports of Seattle and Tacoma, Washington, on the one hand, and various ports and places in Alaska, on the other. Such operations consist of two kinds of service, one seasonal and the other scheduled. The seasonal service is operated during the summer months to and from the seasonal areas of Alaska, namely: Bristol Bay, Nome, Kotzebue and Bering Sea. This service includes the transportation of cannery supplies northbound and canned salmon southbound. The scheduled service is operated year-round to all other areas of Alaska.
 
 
 4
 Northern Commercial serves ports and places along the Yukon River, Alaska, as a common carrier by water in conjunction with the seasonal service of Alaska Steam.
 
 
 5
 Both petitioners are subject to the regulatory jurisdiction of the Commission. On December 18, 1961, Alaska Steam filed with the Commission tariff schedules providing percentage increases in the rates of commodities moving principally, but not exclusively, in the seasonal service. The rate increases, which were intended to become effective on January 18, 1962, were twenty percent on cannery supplies, consisting of cans, cartons and salt, and ten percent on other commodities. These increased rates will be referred to herein as the "company rates."
 
 
 6
 Pursuant to its statutory powers, the Commission suspended these rates for four months pending investigation. The Commission simultaneously instituted an investigation in its Docket No. 969 entitled "Alaska Steamship Company — General Increase in Rates in the Peninsula and Bering Sea Areas of Alaska," to determine whether the increased rates are just and reasonable.
 
 
 7
 Thereafter, Northern Commercial filed tariff schedules with the Commission naming increased rates and charges applying to its service along the Yukon River in conjunction with the seasonal service of Alaska Steam. The Commission suspended these rates for four months and instituted an investigation in its Docket No. 1067 entitled "Northern Commercial Co. River Lines — General Increase in Rates in the Yukon River Area of Alaska," to determine whether the increased rates are just and reasonable.
 
 
 8
 The investigations in Docket No. 969 and Docket No. 1067 were consolidated and hereinafter are called the consolidated dockets. By stipulation the parties agreed that the decision in Docket No. 969 would govern the rates and charges in Docket No. 1067. In view of this circumstance and in accordance with the plan followed by all parties in this review proceeding, we will hereinafter refer to Alaska Steam as if it were the only petitioner, and the company rates as if they were the only carrier-sponsored increases in question.
 
 
 9
 The rate investigation not having progressed to the stage where the Commission could enter a final order prior to the expiration of the four months suspension period, the company rates went into effect on May 18, 1962, and remain in effect to the present time.[1]
 
 
 10
 From December 4 through 15, 1962, a hearing examiner held hearings in the consolidated dockets.[2] The examiner issued an initial decision on May 31, 1963. He held that the company rates produced a rate of return of 19.40 percent on the rate base attributable to the seasonal operation during the 1962 test year,[3] and that such rates are unjust and unreasonable to the extent that they produce a rate of return in excess of twelve percent on this rate base. The examiner further held that the company rates are just and reasonable "* * * to the extent they produce a rate of return up to and including 12 percent. * * *"
 
 
 11
 The Commission's hearing counsel, Alaska Steam, and two intervenors, State of Alaska and General Services Administration, filed exceptions. The Commission heard oral argument on the exceptions and rendered its decision on March 5, 1964.
 
 
 12
 The Commission held that a permissible rate of return for Alaska Steam would be ten percent on the rate base attributable to the seasonal service, and that during the test year the company rates had produced a rate of return of 19.75 percent on that rate base. The Commission ordered Alaska Steam to submit, within thirty days, amended tariff schedules showing rates which would produce no more than a ten percent return on the seasonal service.
 
 
 13
 On April 1, 1964, Alaska Steam petitioned the Commission for a rehearing. In this petition the company sought a reopening of the investigation to receive evidence of the actual results of the seasonal service for 1962 and 1963. In addition, Alaska Steam asserted that the company rates were in compliance with the March 5, 1964 order as actual results for 1962 and 1963 showed that they were not actually producing a rate of return in excess of ten percent. In its petition for rehearing Alaska Steam stated that "* * * if revised tariff schedules were to be filed, consistent with the Commission's findings and conclusions, then based on 1963 operations, Respondents would find it necessary to increase the present seasonal rates an additional 8.082%. * * *" (Emphasis in original.)
 
 
 14
 By order dated May 12, 1964, the Commission denied the petition for rehearing. In response to Alaska Steam's assertion that the company rates were lawful under the Commission order, when viewed in the light of actual operating results in 1962 and 1963, the Commission stated that the company had misconceived the intent of the original order. That intent, the Commission stated in its May 12, 1964 order, was that Alaska Steam would file amended tariffs that would set forth rates based on a ten percent rate of return in the seasonal operation using the figures tested during the proceeding.
 
 
 15
 The Commission added, as a part of its order of May 12, 1964, findings that on the basis of the record in these proceedings the company rates are unjust and unreasonable and that maximum fair and reasonable increases over the level of rates in effect prior to the company rates would be the lesser percentage increases specified in the May 12, 1964 order.
 
 
 16
 Alaska Steam was given fifteen days within which to file amended tariff schedules giving effect to this finding as to appropriate rate increases.[4] Instead of doing so it filed this petition to review both the March 5, 1964 decision and the order of May 12, 1964.
 
 
 17
 Alaska Steam contends that the Commission should have tested the company rates by the results of the overall Alaska operations rather than of the seasonal operations and that, so tested, the company rates are just and reasonable.
 
 
 18
 The Commission agreed with the hearing examiner that the reasonableness of the company rates should be tested by the results of the seasonal service and not by the results of the overall Alaska operations. In order to accomplish this it was necessary to construct a partial rate base attributable to the seasonal service,[5] and to allocate revenues and expenses for the 1962 test year as between scheduled and seasonal service.
 
 
 19
 The selection of a method or formula for computing permissible rates is for the Commission, unless its action is arbitrary. Government of Guam v. Federal Maritime Commission, 117 U.S. App.D.C. 296, 329 F.2d 251, 253-254. In determining whether the selection of a particular method or formula represents arbitrary action, courts look to the reasons which the Commission itself gave for such action, post hoc rationalizations for agency action being unacceptable. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167-168, 83 S.Ct. 239, 9 L.Ed.2d 207. If the Commission's decision of March 5, 1964, discloses a rational basis for testing the company rates by the results of the seasonal operation, its action in doing so is not arbitrary.[6]
 
 
 20
 The Commission's rationale in using the results of a separated seasonal rate base, as set forth in its decision of March 5, 1964, is quoted in the margin.[7] Challenging this line of reasoning, Alaska Steam argues that it is predicated on the erroneous assumptions that the scheduled service was operated at a loss, and that Alaska Steam enjoys a virtual monopoly in its seasonal operation while in its scheduled service the company faces keen competition. The company also argues that there is no other factual or legal justification or rationale supporting such action but, on the contrary, the facts negate such a separation.[8]
 
 
 21
 The question of whether the scheduled service operated at a loss in the test year is discussed at a later point in the opinion in connection with another issue. For present purposes we shall assume, as Alaska Steam contends, that it did not operate at a loss during that year. But even under the company's computation, the gross profits on the scheduled service were only $74,655 in the test year, as compared to a gross profit of $361,484 on the seasonal service.
 
 
 22
 The theory underlying the Commission's quoted rationale is as valid where, as here, the profit on the scheduled service is minimal when compared to the seasonal service, as where the scheduled service is operated at an actual loss. In either case, the effect of rate increases mainly confined to the seasonal service, justified as necessary to provide a reasonable rate of return on the overall operation, is to subsidize the scheduled service at the expense of the seasonal service.
 
 
 23
 Alaska Steam points out that anyone willing to risk substantial loss and to be limited by regulation as to earnings is free to enter the seasonal trade. The company also notes that some seasonal service is rendered by others and that no rate-payer, shipper or other person using the seasonal service appeared and protested the company rates or testified to being "captive shippers." Therefore, Alaska Steam argues, the Commission should not have tested the company rates by the results of the seasonal operation on the assumption, as stated in the quoted Commission statement, that Alaska Steam has a "virtual monopoly" in the seasonal service and that those using that service are "captive shippers."
 
 
 24
 Granting the right of others to enter the seasonal service, not questioned by the Commission, the fact is that Alaska Steam carries from ninety-five to ninety-seven percent of the total salmon packed from ports served by the seasonal vessels on the Alaska Peninsula, Bristol Bay and the Arctic. In the light of that economic fact it was not inappropriate to refer to the company's seasonal service as a "virtual monopoly," and to those using that service as "captive shippers."
 
 
 25
 The significance of this characterization lies in the fact that, since Alaska Steam ran little risk of losing freight by increasing rates on seasonal cargo, there was the danger that seasonal shippers might be compelled to produce a disproportionate share of the necessary revenue needed to sustain the overall operation. If, on the other hand, the rates to be paid by the seasonal shippers must be tested by that operation alone, this danger would not be present.
 
 
 26
 The preceding discussion also demonstrates that importance should be attached to the fact that the increases filed by Alaska Steam apply to commodities moving principally in the seasonal trade.[9] The Commission took this consideration into account, thereby implying that it held the view that if Alaska Steam needed rate increases to sustain its overall operation, it should not have limited its rate increases largely to the seasonal service.
 
 
 27
 Considering together all factors upon which the Commission relied, we think it is established that the Commission had a rational basis for testing the reasonableness of the company rates against the seasonal operation alone. Its action in doing so is therefore not arbitrary.
 
 
 28
 Alaska Steam next argues that, even testing the reasonableness of the company rates by the seasonal service alone, such rates are just and reasonable and the Commission's determination to the contrary resulted from arbitrary action in four particulars. Each of these asserted instances of arbitrary action is discussed below.
 
 
 29
 One of these, the company urges, was the action represented by the Commission's method of computing federal income taxes, to be deducted from gross profit in the test year on the seasonal service produced by the company rates, in determining net profit.[10]
 
 
 30
 The Commission found the gross profit of the seasonal service produced at the company rates to be $361,484 for the test year. The Commission, however, did not compute federal income tax on the seasonal service on the basis of this gross profit figure. Instead, it computed the tax on the $160,064 gross profit figure on the overall Alaska Steam operation for the test year, as shown in the company's exhibit 3-B-5, introduced during the hearing before the examiner.
 
 
 31
 In arriving at its gross profit figure on the overall operation for the test year at the company rates, the company projected a gross profit of $281,182 on the seasonal operation, and losses of $97,970 on the scheduled operation and $23,148 on the offshore, offseason operation. The federal income tax derived by the Commission which used the $160,064 gross profit figure was $77,226, which, obviously, is substantially below a theoretical fifty-two percent on the $361,484 gross profit on the seasonal operation as found by the Commission.
 
 
 32
 If it were true that, using the same methods employed by the Commission in projecting gross profit on the seasonal service, the scheduled service would show a loss in the test year, we do not believe that it would be arbitrary action for the Commission to take that into account in computing federal income tax on the seasonal operation. Under this hypothesis the federal income tax attributed to the seasonal service for the purpose of computing net profit would be less than a theoretical fifty-two percent on the Commission's gross profit figure of $361,484. But there would be a rational basis for using that decreased percentage since, otherwise, the seasonal operation would be charged with an income tax burden which, under the Commission's method of computing gross profit, the company would not bear.
 
 
 33
 But, as the Commission knew, the company's projection of a $97,970 loss on the scheduled service in the test year, as shown in its exhibit 3-B-5 utilized, in one particular, a substantially different method of determining gross profit than that used by the Commission in dealing with the seasonal operation.
 
 
 34
 In that exhibit, the company based annual depreciation expense on estimated useful lives of the vessels of twenty years from date of construction, with the exception of two more recently-acquired vessels which the company depreciated on the basis of a twenty-five-year life. This was in conformity with Alaska Steam's position throughout the proceedings that this was the proper basis of depreciation.
 
 
 35
 But the examiner, giving effect to a determination made by the Commission on April 30, 1963, in its Docket No. 881, General Increases in Alaskan Rates and Charges, 7 F.M.C. 563, 577-578 (1963), determined that:
 
 
 36
 "* * * the useful life period of all of the vessels owned by Alaska Steam, used in the Alaskan trade, is found to be 25 years."
 
 
 37
 The Commission concurred in this determination and accordingly decreased the annual depreciation claimed by Alaska Steam for vessels employed in the seasonal trade in the test year, from $158,627, as claimed by the company, to $108,933. This, of course, had the tendency to maximize gross profit on the seasonal operation for the test year. But neither the examiner nor the Commission made a like adjustment in the company's exhibit 3-B-5, when they chose to use the overall gross profit for the test year, as projected therein, in computing federal income taxes on the seasonal service.
 
 
 38
 Alaska Steam advises us, and the Commission does not dispute this, that had a like adjustment been made in the depreciation figures in exhibit 3-B-5, depreciation on the scheduled operation would have been reduced from $445,933 to $255,715. This decrease in depreciation would have more than offset the $97,970 loss on the scheduled operation as projected in exhibit 3-B-5 and would have removed any basis for calculating federal income tax on the seasonal operation on the assumption that gross profit on that operation had been minimized by a loss on the scheduled service.
 
 
 39
 Without undertaking computations of our own it is quite evident that the 19.75% rate of return on the seasonal service at the company rates for the test year was substantially higher than it would have been had the Commission, in determining federal income tax, applied a hypothetical fifty-two percent rate of return to the $361,484 seasonal gross profit figure fixed by the Commission.
 
 
 40
 In our view, the Commission's determination to compute federal income tax on the assumption that the company lost $97,970 on the scheduled service in the test year, notwithstanding the fact that, applying the Commission's depreciation formula, there was no such loss, represents arbitrary action requiring a remand for further proceedings.
 
 
 41
 The Commission also acted arbitrarily, Alaska Steam asserts, with regard to the manner in which it allocated to the seasonal service a part of the administrative and general expense of the corporation in the test year.
 
 
 42
 The overall administrative and general expense incurred by the company during the test year was $1,625,330. Alaska Steam proposed to allocate a portion of this expense to the seasonal service on the basis of actual vessel days, in accordance with the Maritime Administration's General Order No. 60, 46 C.F.R. § 299.48 (d). This General Order provides for the method of allocating administrative and general expense between the chartered and owned vessels of Alaska Steam to determine the charter hire payable under the provisions of the charter. Three of the vessels operated by Alaska Steam in the seasonal service are chartered from the Maritime Administration.
 
 
 43
 On this basis $410,444 of the administrative and general expense would have been allocated to the seasonal operation. The Commission, however, allocated this expense in the proportion that the total vessel operating expense of each service bears to the total vessel operating expense. Accordingly the Commission allocated $384,228 to the seasonal service, or $26,216 less than the company allocation. Alaska Steam asserts that had its method of allocation been followed, this one adjustment would have reduced the rate of return on the seasonal service for the test year from 19.75 percent as found by the Commission, to less than 12.3 percent.
 
 
 44
 The company argues that the allocation method established by the Maritime Administration is at least prima facie evidence of the proper method of allocation, that there is no evidence in the record to support any other method of allocation, that the Commission decision does not contain findings sufficient to support the method of allocation which it used, and that certain findings made by the Commission tend to support Alaska Steam's allocation method.[11] In view of these considerations, Alaska Steam argues, the Commission acted arbitrarily in the matter of allocating a portion of the overall administrative and general expense to the seasonal operation.
 
 
 45
 In establishing its allocation method the Maritime Administration is engaged in determining excess charter hire. In formulating its allocation method, the Commission is engaged in economic regulation. In view of the disparity of objectives we do not believe that, in a rate case before the Commission, the Maritime Administration's allocation method can be regarded as prima facie evidence of the proper method. It is a factor to be considered, and nothing more.
 
 
 46
 Perhaps, as Alaska Steam asserts, the record does not contain testimony or exhibits tending to support the allocation method adopted by the Commission, as preferable to that proposed by the company. But the examiner and Commission were entitled to, and did, take official notice of the allocation method utilized by the Commission in General Increase in Rates (1961), 7 F.M.C. 260, at 288 (1962), referred to herein as the Hawaiian case.
 
 
 47
 In that case an allocation between passenger service and freight service was necessary. The Commission chose to allocate expenses between the two services as it has done here, in preference to a revenue prorate method of allocating expense. While the Commission was not there called upon to reject the Maritime Administration's allocation method, it did determine that an allocation of Administrative and general expenses on the basis of comparative operating expenses of the two services, was appropriate for rate-making purposes.[12]
 
 
 48
 It is true that the Commission's determination, in the Hawaiian case, as to the appropriate allocation method to be applied, is not necessarily controlling here. Whatever allocation method has been found to be suitable in other rate cases, it is always open to a carrier to show that, under the facts of its case, that method would not be equitable.
 
 
 49
 The company refers to the Commission findings referred to in note 11, as demonstrating that the Commission's allocation method works out inequitably in this case. These findings have some tendency in that direction notwithstanding the fact that they were made with particular reference to the matter of working capital. But we are unable to say on this record that still greater inequities from the public point of view, or that other counterbalancing disadvantages such as those associated with the complexity of the Maritime Administration formula, might not have inhered in accepting, for rate-making purposes the latter's allocation method.
 
 
 50
 The Commission made a considered choice between the two methods.[13] In our view, the reasons which it gave for choosing the prorating of operating expenses method of allocating administrative and general expenses, are adequate when measured by the standards of adequacy of such findings announced in Government of Guam v. Federal Maritime Commission, 117 U.S.App.D.C. 296, 329 F.2d 251, 254-256. The Commission's choice of the allocation method does not represent arbitrary action.
 
 
 51
 Alaska Steam contends that the Commission acted arbitrarily in determining the permissible rate of return on the property devoted to the seasonal service.
 
 
 52
 Alaska Steam produced testimony by one witness to the effect that the company would require a rate of return of twenty to twenty-five percent to prevent attrition of capital. No other evidence was offered. The examiner found that while the rate of return needed cannot be determined on this record with exactitude, in order to give effect to the applicable principles in establishing just and reasonable rates, a "reasonable maximum" rate of return for Alaska Steam in its seasonal service is twelve percent. The examiner therefore found and concluded that the company rates are unjust and unreasonable to the extent that they produce a rate of return in excess of twelve percent.
 
 
 53
 In the subsequent proceedings before the Commission, the latter disagreed with the examiner's finding that "a reasonable maximum rate of return" should be set in this case, holding that it was unnecessary for the Commission to bind itself by setting a maximum rate of return. As to the actual rate of return to be allowed, the Commission also disagreed with the examiner, finding that the company rates are unjust and unreasonable to the extent that they allow Alaska Steam a rate of return in its seasonal service in excess of ten percent.
 
 
 54
 There is no disagreement between the parties as to the principles to be applied in fixing an appropriate rate of return for rate-making purposes.[14] The company argues that the testimony which it produced gave effect to these criteria and is consonant with the principles applied by the Commission in the Hawaiian case. Moreover, the company contends, the Commission determination that the rate of return on the seasonal service should not exceed ten percent is not supported by findings, based on testimony, that this is a fair and reasonable rate of return.
 
 
 55
 In rejecting the testimony of the company expert as to the appropriate rate of return, the Commission expressed the view that this witness did not "* * * take into consideration the realities of the situation." Explaining what it meant by this, the Commission pointed out that Alaska Steam is a closely-held Seattle-based corporation which does not go to the public for capital. All of the other companies referred to by the company expert for comparative purposes were publicly owned, and only one of them was based in Seattle.
 
 
 56
 In discussing the question of rate of return the Commission also found that the seasonal operations of Alaska Steam "* * * have perhaps a higher degree of risk than other steamship operations." But the agency also noted that the company occupies a "monopolistic" position in the seasonal trade, the effect of which is to minimize the greater business risk resulting from the seasonal character of the operation.[15]
 
 
 57
 We do not find in these reasons for rejecting the rate-of-return opinion of the company expert, the indicia of arbitrary action.
 
 
 58
 In the Hawaiian case the Commission found rates of return of 8.32 percent for 1960 and 10.59 percent for 1961 not to be excessive in the Hawaiian trade. In that case the Commission determined the lawfulness of proposed Pacific coast-Hawaiian rates upon the results of operations by Matson Navigation Company (Matson), which carried from eighty-eight to 91.3 percent of the cargo. The Commission's finding that the rate of return percentages referred to above would not be excessive for Matson in the Hawaiian trade was based, in part, on the agency's view that Matson, "* * * is also subject to competition by other carriers who are free to enter the trade, * * *" Alaska Steam asserts that the same facts are true as to its seasonal operation, yet the Commission, departing from the course it followed in the Hawaiian case, held that "* * * risk to capital is reduced by Alaska Steam's monopolistic position in the trade."
 
 
 59
 On most of the seasonal operation, as heretofore noted, Alaska Steam carries from ninety-five to ninety-seven percent of the salmon pack, which is the principal cargo. It is therefore experiencing substantially less competition than that which confronts Matson in the Hawaiian trade. Yet the Commission has allowed nearly as large a rate of return on the seasonal operation (ten percent) as it did on the Hawaiian trade for 1961 (10.59 percent).
 
 
 60
 The basic principles to be applied in determining the proper rate of return do not vary from case to case. But the differing factual backgrounds of each case are usually such that the particular rate of return found reasonable in one case is not a reliable guide of what it should be in another. We are not convinced that the Commission's determination as to this in the case now before us so substantially and unjustifiably departs from what it did in the Hawaiian case, that arbitrary action is indicated.
 
 
 61
 In Docket No. 881, General Increases in Alaskan Rates and Charges, 7 F.M.C. 563 (1963), the Commission in testing a ten percent rate increase applicable alike to Alaska Steam's scheduled and seasonal service, allowed a rate of return of 9.07 percent on the overall operations. The company correctly points out that there is nothing in that decision to indicate that the Commission intended to fix a maximum allowable rate of return. The Commission has not held otherwise here, having expressly rejected the examiner's finding that a reasonable maximum rate of return should be fixed. But the actual rate of return of ten percent on the seasonal operation, against which the Commission found that the reasonableness of company rates should be tested, substantially exceeds the actual rate of return applied in General Increases in Alaskan Rates and Charges.
 
 
 62
 We hold that the Commission did not act arbitrarily in dealing with the question of rate of return.
 
 
 63
 The fourth and final respect in which the Commission acted arbitrarily in testing the reasonableness of the company rates by the seasonal service, Alaska Steam asserts, is in its determination of the working capital requirement of the company for inclusion in its seasonal rate base.
 
 
 64
 At the hearing before the examiner, two witnesses called by the company testified as to the overall working capital requirement of Alaska Steam. One expressed the opinion that the overall working capital requirement was not less than $3,000,000. The other gave a minimum figure of $2,800,000. Allocated as between scheduled and seasonal service the lesser of these sums would have established $661,920 as the working capital on the seasonal service. The examiner, however, allowed only $453,090 for working capital on the seasonal service, and the Commission upheld this determination.
 
 
 65
 On this review, Alaska Steam argues that the Commission erred in not accepting the testimony of the two company witnesses as to required working capital, pointing out that there is no other evidence in the record bearing upon this matter. The testimony of these two witnesses is summarized in the margin.[16]
 
 
 66
 The Commission rejected the figures provided by these witnesses on the ground that they were, in essence, based on the difference between current assets and liabilities on the company's balance sheet at a given time, plus approximately half as much again for contingencies, and that a figure so derived bears no relationship to the needs of the carrier.
 
 
 67
 We agree with the Commission that, whatever the justification may be for the working capital figures submitted by the company witnesses, they were essentially derived in the manner described. It would be purely coincidental if a figure so determined fairly represented the working capital requirements of a carrier or utility. As indicated by a generally accepted definition of working capital set out in the margin, the excess of current assets over current liabilities, as such, has no relation to company needs, the latter being the controlling factor in determining working capital.[17]
 
 
 68
 The company witnesses expressed the view that the figures submitted by them represented the working capital needs of Alaska Steam. No other witness expressed a different view. But while the financial and operating data of a carrier is subject to factual proof, the determination of its prospective working capital needs necessarily brings into play judgment factors lying in the realm of opinion.
 
 
 69
 The company witnesses were expressing informed opinions. In rejecting those opinions the Commission, also informed as to the relevant financial and operating facts, and in addition having expertise in the economic regulation of steamship companies, generally, expressed a contrary opinion. We cannot say, on this record, that the Commission acted arbitrarily because it did not give up its own opinion and accept that of the company witnesses.
 
 
 70
 Alaska Steam also makes a general attack upon the method utilized by the examiner and Commission in arriving at a seasonal working capital figure of $453,090.
 
 
 71
 This figure was computed according to the method prescribed in Maritime Administration General Order No. 31, 2d Revision, 46 C.F.R. § 286.3, Limitation (4), with insurance for a ninety-day period as required by that formula. Alaska Steam points out that this General Order was adopted for the purposes of applying the reserve and recapture provisions of Operating — Differential Subsidy Agreements (46 C.F.R. § 286.0), and that Alaska Steam does not operate under such subsidy agreements. A figure so determined, the company asserts, does not furnish a realistic measure of working capital used and needed for the purpose of serving the Alaskan trade.
 
 
 72
 The Commission did not utilize the General Order No. 31 formula on the supposition that Alaska Steam has a subsidy operation, but because that formula provides a tested way of deriving a figure representing the average voyage expenses for each vessel in the carrier's fleet. As early as its predecessor's 1957 decision in Pacific Coast/Hawaii and Atlantic-Gulf/Hawaii General Increases in Rates, 5 F.M.B. 347, 350, 355, the Commission decided that this averaging of one-voyage expenses was an appropriate way to determine working capital requirements. See Government of Guam v. Federal Maritime Commission, 117 U.S.App.D.C. 296, 329 F.2d 251, 256.
 
 
 73
 The reasoning behind this theory was first expressed by the Commission in Atlantic & Gulf-Puerto Rico General Increase in Rates and Charges, 7 F.M.C. 87, as quoted in the margin.[18] This method of computing working capital has since been utilized by the Commission in General Increases in Alaskan Rates and Charges, 7 F.M.C. 563, at 582 (1963), and in the Hawaiian case, 7 F.M.C. 260, at 289 (1962).
 
 
 74
 However, the sum total of the voyage expense of one round trip for each vessel engaged in a particular steamship operation is not necessarily a fair gauge of the carrier's working capital needs in that operation. This was made clear in Government of Guam v. Federal Maritime Commission, 117 U.S.App.D.C. 296, 329 F.2d 251, 256-257, where working capital, so derived, amounted to forty-seven percent of the total rate base. Noting this "apparently incongruity,"[19] and holding that the Commission had made no findings and stated no conclusions to support its reason for applying the General Order No. 31 formula in that case in determining working capital, the court remanded the case for further proceedings.
 
 
 75
 The Commission decision in the case before us contains a rather full statement as to the various factors to be taken into consideration in determining the working capital requirements of Alaska Steam in its seasonal operation.[20] There are no specific findings or conclusions as to why a computation based on one round-trip voyage expense of each vessel would produce an adequate working capital figure taking into account the factors mentioned.
 
 
 76
 But the Commission was entitled to, and did, take official notice of its past decisions in which the same formula was applied, including the 1963 case involving the overall operations of Alaska Steam. General Increases in Alaskan Rates and Charges, 7 F.M.C. 563, at 582 (1963). Such notice carried with it the reasons relied upon in the past cases concerning the appropriateness of using this formula. The most comprehensive statement of these reasons, contained in the decision in the Puerto Rico case, is quoted in note 18.
 
 
 77
 We do not find in the record any factual basis for finding that a working capital formula appropriate for Alaska Steam's overall operations, is not appropriate for its seasonal operation. There is, indeed, some reason for believing that this formula tends to produce a more liberal figure for the seasonal working capital than for overall working capital, since the seasonal vessels are in actual operation only seven months of the year. At the examiner's hearing, the agency's hearing counsel advanced this as a reason for reducing the $453,090 figure to seven-twelfths of that amount, or $264,287. But the examiner and the Commission rejected that suggestion.
 
 
 78
 Absent a more direct and specific factual attack upon the adequacy of the $453,090 working capital figure the Commission allowed for the seasonal operation, we conclude that it is based upon adequate findings and a sufficient statement of reasons, and that the Commission did not act arbitrarily in this regard.
 
 
 79
 As stated earlier in this opinion, the Commission, in its order of May 13, 1964, denying Alaska Steam's petition for rehearing, also ordered the company to file amended tariff schedules which would have the effect of reducing the percentage increases on the seasonal service under the company rates to substantially lower percentage increases. The percentage increases thus authorized were 3.6 percent (in lieu of ten percent) on general cargo to the seasonal areas of Alaska, 7.3 percent (in lieu of twenty percent) on salmon cannery cargo, and 3.6 percent (in lieu of ten percent) on southbound canned salmon products from all areas of Alaska. These maximum increased rates authorized by the Commission will be referred to herein as the "Commission rates."
 
 
 80
 The Commission does not, in this order or elsewhere, describe how it arrived at the Commission rates, but merely found that they are "fair and reasonable." The company contends that this deficiency renders this provision of the May 13, 1964 order invalid.
 
 
 81
 Presumably, the Commission rates are designed to produce a rate of return of ten percent on the seasonal rate base of $1,552,816. The company points out that this result could be obtained by a sufficient reduction in revenue to result in a gross profit which, if subject to no income taxes, would together with the net profit from related companies, produce the desired rate of return. The company believes that this is what was done.[21] But if this is true there is an error in the Commission's calculation for it would make no allowance for the fact that the gross profit on the seasonal operation resulting from the Commission rates would be subject to income taxes.
 
 
 82
 In order to review the question of whether the Commission rates involve such an error, or some other error, and are the product of arbitrary action it is necessary for us to know the basis on which they were computed, and the Commission's reasons for selecting that basis. The failure of the Commission to disclose that information in its order of May 13, 1964, makes it necessary to remand the proceedings for findings and conclusions on the matter.
 
 
 83
 Alaska Steam argues that the Commission acted arbitrarily in denying the motion to reopen the investigation to receive evidence of the actual results of the seasonal service for 1962 and 1963.
 
 
 84
 When that motion was made on April 1, 1964, while the proceeding was still pending before the Commission, the operating results for 1962 and 1963 were known and, the company states, were not in dispute. The company further asserts that the use of those figures instead of the 1962 test year figures in computing rate of return at the company rates on the seasonal service, according to the Commission's own formula, involved only a simple arithmetic computation.
 
 
 85
 The Commission points out, however, that no matter how simple such a computation might have been, it could not have been accomplished without remanding the proceeding to the examiner, with all of the attendant delays this would involve. The Commission argues that in the interests of bringing an end to the investigation and getting an agency rate order into effect, the Commission was warranted in denying the motion to reopen.
 
 
 86
 We need not decide whether there was an abuse of discretion in denying the motion to reopen, made on April 1, 1964, because, in our view, Alaska Steam in the remanded proceedings should be permitted to renew that motion in the light of circumstances as they now exist.[22]
 
 
 87
 Another year has passed since the motion to reopen was first made and, with it, the actual seasonal operating results for an additional calendar year, 1964, have become available. If it is of any significance who is responsible for that year's delay in obtaining an effective rate order, the Commission must, in view of the errors found in its decision and order, accept its share of the blame.
 
 
 88
 With the passage of each year, the 1962 test year becomes more and more vulnerable to the charge of staleness. It therefore has less and less to recommend it as a reliable basis upon which to predicate a prospective rate order. Moreover, in April, 1964, time was to be saved by not reopening the proceeding to receive later operating figures. This may not now be a persuasive factor. Perhaps no substantial delay may be occasioned by a reopening now to receive actual operating figures inasmuch as the proceeding must in any event be reopened on the remand ordered herein.
 
 
 89
 We make these observations not to indicate that it would necessarily be an abuse of discretion for the Commission not to reopen the investigation to receive later operating figures. There may be considerations not drawn to our attention which would warrant such a denial. The circumstances adverted to above, however, are sufficient to indicate to us that Alaska Steam ought to have the opportunity to again move for a reopening to receive later operating figures to be utilized in arriving at a rate of return on the seasonal service computed according to the Commission formula approved herein. Nothing said above should be taken as indicating that the Commission is required to entertain a motion to reopen for any other purpose.
 
 
 90
 Alaska Steam contends that the decision and order contravene its rights under the Fifth Amendment. It is unnecessary to consider this contention at the present time. The remanded proceedings may result in a rate order which does not aggrieve Alaska Steam, in which event its constitutional argument will become moot.
 
 
 91
 The Commission decision of March 5, 1964, and the Commission order of May 12, 1964, are reversed for the reasons stated in this opinion, and the cause is remanded to the Commission for further proceedings.
 
 
 
 Notes:
 
 
 [1]
 But for these review proceedings, the company rates would have been discontinued by the summer of 1964 pursuant to one of the Commission orders here under review. After the review was instituted we entered an order, dated June 2, 1964, staying the Commission's orders pending the disposition of this petition for review
 
 
 [2]
 The State of Alaska, Port of Anchorage, Alaska, United States Department of the Interior, General Services Administration, and Puget Sound-Alaska Van Lines, a division of Puget Sound Tug and Barge Company, intervened in the proceedings before the examiner
 
 
 [3]
 Operating data for November and December, 1962, were not available prior to the conclusion of the hearing before the examiner. The 1962 test year therefore means the twelve consecutive months commencing with November, 1961
 
 
 [4]
 The Commission order of May 12, 1964, also contains this provision:
 "Although in the absence of suits for reparations pursuant to section 22, Shipping Act, 1916, we have no power to order Alaska Steam to repay to shippers charges in excess of those we find fair and reasonable, we can require that the amount realized from the unlawful portion of the increase `be utilized for the benefit of the class who paid it. * * *'1 [1 Bebchick v. Public Utilities Commission, 115 U.S.App. D.C. 216, 318 F.2d 187, 203 (D.C.Cir. 1963).] While in this case we do not have a record which is adequate to base a determination of how the excessive revenue can now be returned to the public, we will consider such revenue in determining the reasonableness of any future increases in the rates in the seasonal Alaska trade." (Emphasis in original.)
 
 
 [5]
 Alaska Steam employs fourteen vessels in the overall operation of which seven are employed principally but not exclusively in the scheduled service and seven are employed principally but not exclusively in the seasonal service. Valuing the vessels and other property attributed to the seasonal operation in accordance with a prudent investment standard which utilized net book value, and adding a figure for working capital, the hearing examiner arrived at a rate base on the seasonal operation of $1,552,816. The Commission accepted this figure
 
 
 [6]
 See Eustace v. Day, 114 U.S.App.D.C. 242, 314 F.2d 247, equating arbitrariness with a lack of a rational basis for the action taken
 
 
 [7]
 "The increases filed by Alaska Steam apply to commodities moving principally in the `seasonal trade.' In this trade Alaska Steam enjoys a virtual monopoly, while in its `scheduled trade' it faces keen competition. The record shows that Alaska Steam has reduced its rates in the scheduled trade. Alaska Steam has put forth no convincing rationale as to why we should measure the increases here by the results of the carrier's overall operations. To do so would, in our opinion, allow the carrier to offset losses in the competitive trades with profits from the trade in which it presently enjoys a virtual monopoly. Shippers in the seasonal trade are dependent upon Alaska Steam's service. We think it would be unfair to saddle such captive shippers with the burden of the carrier's losses resulting from operations in the scheduled trade. The separation of services and construction of a partial rate base, while perhaps subject to some infirmities regarding exactitude of allocations, is the fairest method of testing these increases."
 
 
 [8]
 In this connection Alaska Steam calls attention to the facts that one management supervises both the scheduled service and seasonal service, and that common headquarters and facilities are used in Seattle. Alaska Steam also asserts that the scheduled service is the backbone of the company's operations and that absent the scheduled service, there could be no seasonal service
 
 
 [9]
 According to the report of the examiner, Alaska Steam's estimated revenues attributable to the rate increases it put into effect total $396,412, $37,178 from seasonal cargoes and salmon and cannery supplies carried by scheduled vessels and $359,234 from the same type of cargo carried by the seasonal vessels
 
 
 [10]
 To conform to terminology used by the parties, the term "gross profit" is used to mean annual revenue less those items of expenses allowed by the Commission in determining gross profit before income taxes. The term "net profit" is used to mean gross profits less income taxes. The Commission had to determine net profit in the test year on the seasonal service, produced by the company rates, in order to arrive at an estimated rate of return for that year on the property devoted to the seasonal service under the company rates
 
 
 [11]
 Alaska Steam here refers particularly to a statement in the Commission decision consisting of the first three sentences quoted in note 20, infra
 
 
 [12]
 In explanation of the allocation method there followed, the Commission stated at page 288 of its decision in the Hawaiian case:
 "Where direct allocations are impossible or impracticable, expenses should be allocated between the passenger and freight services on the basis of the relation that the expenses incurred in the passenger and freight operations separately bear to the total expenses incurred in the operation of both. Administrative expenses should follow the expenses to which they relate. If revenues were used as a basis of allocating expenses, the increase in revenue resulting from a freight rate increase would result in an increased allocation of expenses. A rate increase might be used as the basis for justifying a further increase in rates."
 
 
 [13]
 After noting that the allocation method which it adopted followed the earlier precedent set in the Hawaiian case, and that the Maritime Administration's method involves a "complex formula" relating to excess charter hire, the Commission stated, in its report:
 "* * * since administrative and general expenses are a mixture of salaries and expenses that pertain to the over-all management and operation of Alaska Steam, logical reasoning dictates that their allocation should follow those expenses (i.e. vessel operating expenses) that management must control to profitably operate the business. Under the circumstances, we believe that the Examiner's allocation was fair and equitable. The very fact that these expenses are being allocated means that exactitude is impossible, and Alaska Steam has not shown on the record that the Examiner's allocation is inequitable or unfair."
 
 
 [14]
 In stating these criteria the Commission said in its report:
 "The criteria to be employed in a determination of a rate of return are well settled. In Bluefield [Water Works & Imp.] Co. v. Public Service Commission, 262 U.S. 679, at 693 [43 S.Ct. 675, 67 L.Ed. 1176] (1923) the Court said: `The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.' And in Power [Federal] Commission v. Hope [Natural] Gas Company, 320 U. S. 591, at 603 [64 S.Ct. 281, 88 L.Ed. 333], the Court stated: `The rate-making process under the Act, i.e., the fixing of "just and reasonable" rates, involves a balancing of the investor and the consumer interests * * * From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock.'"
 
 
 [15]
 Apart from the business risk, the Commission stated that it was unconvinced that the physical hazards of the seasonal operation are any greater or should be given more weight than they are in any other trade
 
 
 [16]
 One of these witnesses was William Paul McCarthy, auditor of Alaska Steam. He testified on direct examination that, based on his many years of experience with the company, the "absolute minimum" working capital requirement for the overall operation was not less than two million dollars, and that this would not include any allowance for such contingencies as major strikes, closedowns, or marine casualties. Adding what he regarded as a fair and reasonable allowance for such contingencies McCarthy expressed the opinion that the overall working capital should not be less than three million dollars. On cross-examination this witness stated that his two million dollar figure represents the excess of current assets over current liabilities. According to the company's exhibit 2-A-4, overall total current assets on December 31, 1961, were $3,102,979, and total current liabilities were $1,062,340
 The company's other witness on the question of working capital was R. Orville Dresback, Alaska Steam's independent certified public accountant. On direct examination, Dresback expressed the opinion that the proper overall working capital requirement of the company for the tax year was $2,800,000. He testified that this sum was composed of two items. The first, in the amount of $1,800,000, was the approximate amount of the company's excess of current assets over current liabilities, but excluding cash items, in August, 1961, a month of maximum activity. The second was the required amount of cash for current operations and emergencies, which Dresback placed at one million dollars.
 In arriving at this cash figure, the witness took into account several factors. One of these was that the company, in August, 1961, had $980,086 of cash or its equivalent. Another was that this much cash would be needed if a two to one ratio of current assets to current liabilities was to be maintained, the witness recognizing, however, that this ratio is not a standard that can be used in all businesses. Other factors considered were that in August, September and October, 1961, the disbursements were at the rate of approximately $100,000 a day, and the need to have a cash fund to meet emergencies, such as those due to casualties and strikes.
 
 
 [17]
 "Working capital, in the technical sense in which it is here employed, does not include the total liquid funds with which the business is conducted. It is not the property which the businesshas: that is, it is not the excess of current assets over current liabilities. Working capital, rather, is an allowance for the sum which the company needs to supply from its own funds for the purpose of enabling it to meet its current obligations as they arise and to operate economically and efficiently." (Emphasis in original) Barnes, Economics of Public Utility Regulations, 495 (1942).
 
 
 [18]
 "Working capital is required to meet the need which `arises largely from the time lag between payment by the Company of its expenses and receipt by the Company of payments for service in respect of which the expenses were incurred.' Alabama-Tennessee Nat. Gas Co. v. Federal Power Commission, 203 F.2d 494, at 498 (3 Cir. 1953). The Conference tariff specifies that freight must be prepaid. There would appear to be, therefore, no substantial lag between payment of expenses and receipt of revenues. To the extent there is any such lag, the working capital allowed by the Board — an amount approximately equal to one round voyage expense of each vessel in the service — is ample to take care of the carrier's needs (6 F.M.B. 14)."
 
 
 [19]
 The court said, at page 256: "Working capital is rarely, if ever, so large a proportion of the funds committed to this type of enterprise." By comparison, the $453,090 working capital on the seasonal service allowed by the Commission in our case is approximately twenty-nine percent of the total rate base
 
 
 [20]
 The Commission stated:
 "In examining Alaska Steam's operations, it is readily apparent that the seasonal service requires working capital. Alaska Steam engages in substantial pre-season planning and in a certain amount of post-season wind-up of operations, finding it necessary to maintain a year-round staff to insure that the seasonal operations go smoothly. Alaska Steam has considerable inactive vessel expenses attributable to the seasonal service, and part of its administrative and general expenses attributable to the seasonal service must be met throughout the lay-up months and the slack months when little cargo is being carried. The record shows that Alaska Steam's carryings in the seasonal service for 1962 went from a low of 5,000 revenue tons in May to a high of 42,000 revenue tons in August.
 "In 1962, inactive vessel expenses allocated to the seasonal service were $250,013. Administrative and general expense allocated to the seasonal service was $384,229. Alaska Steam needs working capital to cover its inactive vessel expense, and the allowance for working capital should include provision for part of the $384,229 of administrative and general expense which will be incurred in off-months. The allowance for working capital must also take into account cash requirements during other periods when revenues do not cover costs such as costs resulting from periods of vessel lay-up due to accidents, periods of increased vessel operating costs prior to the effective date of increased rates, and periods of strike."
 
 
 [21]
 The company calculates that the gross profit of the seasonal service for the test period, based on the Commission rates, would be $131,680, and adding $23,461 net profit of related companies would produce a total net profit of $155,141, or within $140 of the amount required to produce a ten percent rate of return
 
 
 [22]
 For the same reason Alaska Steam's pending motion in this court for leave to adduce additional evidence is denied without prejudice